[Cite as *Waddell v. Grant/Riverside Med. Care Found.*, 2017-Ohio-1349.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Rosalyn Waddell (Kenner), | : | |
| Plaintiff-Appellant, | : | |
| v. | : | No. 15AP-982 |
| | | (C.P.C. No. 13CV-1273) |
| Grant/Riverside Medical Care | : | |
| Foundation et al., | | (REGULAR CALENDAR) |
| | : | |
| Defendants-Appellees. | | |
| | : | |

D E C I S I O N

Rendered on April 11, 2017

**On brief:** *Mowery Youell & Galeano, Ltd., Merl H. Wayman*, and *James S. Mowery, Jr.*, for appellant. **Argued:** *Merl H. Wayman*.

**On brief:** *Baker & Hostetler LLP, David A. Whitcomb*, and *Lindsey D'Andrea*, for appellees. **Argued:** *David A. Whitcomb*.

APPEAL from the Franklin County Court of Common Pleas

SADLER, J.

{¶ 1} Plaintiff-appellant, Rosalyn Waddell (Kenner), appeals from the judgment entry of the Franklin County Court of Common Pleas granting the motion for judgment notwithstanding the verdict ("JNOV") and alternative motion for new trial filed by defendants-appellees, Grant/Riverside Medical Care Foundation et al., on appellant's race discrimination claim. For the following reasons, we affirm the decision of the trial court.

## I.  FACTS AND PROCEDURAL HISTORY

{¶ 2}   Appellant is a licensed and registered senior x-ray technologist practicing CT scan procedures whom appellees employed from approximately December 1991 to May 24, 2012, the date appellees terminated appellant's employment.  At the time of the termination, appellant worked alongside three other technologists—Debbie Johnson, Lori Shoemaker, and Patty Hudland—in the CT scan unit of one of appellees' imaging facilities. Appellant reported directly to Dave Taylor.  Taylor reported to Dave Partridge, who in turn reported to Jason Theadore, appellees' director of imaging departments.  Appellant was the only African-American employed in the CT scan unit.

{¶ 3}   As an employee with OhioHealth, appellant signed a Confidentiality Statement of Understanding that provided:

> It is the responsibility of all persons granted access to confidential information to protect the confidentiality of patient and hospital information and to make use of that information only to the extent authorized and necessary to provide patient care and/or perform a proper Hospital, Medical Staff or Educational function * * * as this confidential information is available only on a Need-to-Know basis, I will not access confidential information without authorization and will do so only when required to do so.

(Confidentiality Statement of Understanding at 1.)   Under OhioHealth's Human Resources Policy and Procedure, "Serious Misconduct" that warranted termination of employment included "[u]nauthorized access, release, or use of confidential information concerning a patient, the organization, or another associate. (i.e. HIPAA violation)" as well as "[a]buse and/or negligence of duty with a potentially serious impact on the organization * * * includ[ing] gross and/or willful disregard for safety or Red Rules." (Appellees' Ex. 2 at 4.) Furthermore, under OhioHealth's Radiology Reportable Events Policy, each technologist was under a duty to report to management when a patient received a radiology procedure that was not prescribed.

{¶ 4}   The technologists worked in pairs to conduct CT scans for patients.  One technologist, the "IV person," was responsible for interacting with the patient, administering the patient's IV, and running the "contrast injector machine."  (Plaintiff's Ex. A at 1; Tr. Vol. 3 at 84.)  Meanwhile, the other technologist, the "computer person,"

was responsible for completing the computer scan and transferring the images to the "PACS" medical records system, consulting with both the radiologist about protocols and the doctor's office about concerns, and conducting quality assurance at the end of their duty as the computer person. (CT scan unit flow chart, Plaintiff's Ex. A at 2; Tr. Vol. 3 at 85.) Quality assurance included reviewing whether the patient's scanned images transferred to the PACS system for radiologists to review. The technologists would switch roles at lunch: the IV person from the morning would become the computer person in the afternoon and vice versa.

{¶ 5} On the morning of Wednesday, May 16, 2012, appellant worked as the IV person while Debbie Johnson worked as the computer person. At approximately 8:30 a.m., Johnson scanned a patient prior to contrast being injected into the patient's arm. After noticing the error and without consulting a radiologist or manager, appellant injected the patient with contrast and Johnson scanned the patient a second time, subjecting the patient to another dose of radiation. Neither appellant nor Johnson reported the incident to management at that time. Rather, appellant testified that she told Johnson it was Johnson's responsibility to report the incident to management and to transmit all the images to PACS, including, as required by appellees' policies, the images scanned in error. Appellant said Johnson nodded her head in agreement. Appellant later agreed that every radiology technologist who becomes aware of an over-radiation incident had an obligation to report that event and that over-radiating a patient could be dangerous to the patient's health.

{¶ 6} According to appellant, because Johnson previously failed to report over-exposure incidents, appellant was concerned Johnson would not report the incident, but appellant was hesitant to report the incident to management herself because her performance evaluation noted co-worker complaints about working with her, and the complaints seemed to stem from appellant's previous reports of their mistakes.

{¶ 7} When appellant was the computer person in the afternoon of May 16, she saw that all the patients' images had not yet been sent to the PACS system. Appellant left work early, at about 2:30 p.m., and discussed the incident with a former supervisor who worked at another OhioHealth facility. The former supervisor advised appellant to report the incident. At about 4:30 p.m., appellant called Taylor and asked if anyone had

reported an over-radiation incident and, according to appellant, let Taylor know that all the images for a patient were not transferred to PACS.  Appellant later agreed that, in response to deposition questioning about whether Taylor knew that all the images had not been transferred to PACS, she did not mention the images transfer on this initial call to Taylor and that, at some point during the call, appellant expressed concern that Johnson was going to "get off free because she is dishonest."  (Tr. Vol. 4 at 129.)  Taylor responded that he would discuss the incident with Theadore and would speak with appellant in the morning.  Theadore assigned Partridge and Kay Holland, another imaging manager who is Caucasian, to investigate the incident.

{¶ 8}   The next day, Thursday, May 17, appellant worked in the x-ray department, rather than the CT scan unit.  Appellant agreed that Taylor told her she was "removed from the situation" and "should not have had anything further to do with this case from that Thursday morning, 8:00 a.m., May 17, 2012 and on" and that she went into the PACS system anyway and accessed the patient's study. (Tr. Vol. 4 at 130.) According to appellant, she believed that Taylor meant she should have no further involvement in reporting the case and that although quality assurance is initially the responsibility of the computer person who scanned that patient, she thought it was her shared duty "for the care of the patient to follow that study until the entire exam is completed and sent to the radiologist to be read."  (Tr. Vol. 3 at 99-100.)  Appellant testified that appellees previously disciplined her for failing to conduct quality assurance with the PACS system for a patient.  Appellant testified that she accessed the PACS system on May 17 for this patient care purpose.  Appellant then agreed that when she noticed the non-contrast images had still not been sent, appellant did not inform Taylor or anyone else that the patient's study continued to be incomplete and did not attempt to find and send the images to the PACS system herself.

{¶ 9}   On the morning of Friday, May 18, appellant worked as the computer person in the CT scan unit.  Appellant testified that in performing the part of her job of deleting files to free up raw data space on the computer, she accessed the patient's images on the CT workstation computer.  According to appellant, she did not want to delete this particular patient's study from the system if there was a problem with it.  Appellant saw

that the patient's non-contrast images were still not in the file, and because the day became busy, she did not tell anyone.

{¶ 10} That same morning, appellees interviewed Johnson, who admitted that she had not sent the images from the first scan to PACS. Johnson was immediately suspended. Partridge and Holland went to the CT workstation to try to locate the images, and after they retrieved them, Partridge asked appellant to send those images to the radiologist.

{¶ 11} On Monday, May 21, Taylor met with appellant and asked her to write a statement of what occurred during the over-radiation incident. Later, Partridge and Holland interviewed appellant. During the interview, appellant told Partridge and Holland that she knew Johnson had not sent the images to PACS, and when asked how she knew, appellant told them she accessed the PACS medical records system on May 17. Appellant testified that she told Partridge and Holland that part of the reason she accessed the medical record on May 17 was to see if Johnson was telling the truth or lying because, at least in part, she was concerned that Johnson was going to get away with this incident. According to appellant, she also checked the patient's record in the PACS system "to see if the images were available, to see if I could send the images on this patient to be read by the doctor." (Tr. Vol. 3 at 108.) Regarding checking the patient file on May 18, appellant stated to Partridge and Holland, "that was my job that morning before I deleted any studies, to make sure everything had been completed and sent on to the radiology [sic]; and if I'm aware of anything that's not complete, I cannot delete it." (Tr. Vol. 3 at 108.) At trial, appellant agreed that it is improper to access a patient's record to determine whether a co-worker lied and agreed that improperly accessing a patient's records and/or committing a HIPAA violation is a terminable offense.

{¶ 12} Later that day, Partridge and Holland returned and told appellant she was suspended from work pending an investigation into the incident and gave her paperwork documenting the suspension. According to the "description of behavior/situation & impact" section of the suspension paperwork:

> On Wednesday 5/16/12 a patient was scanned incorrectly at aprox. 8:40 am. At that time no report was created and there was no communication to leadership. At approx. 4:40 pm. Rozalyn called Supervisor to inform him of incident. At that

time Rozalyn was told that she was removed from the situation and the Jason Theadore would take care [sic] the investigation from moving forward. Rozalyn opening [sic] admitted to calling a peer from the organization and discussing the case that day. On 5/17/12, Rozalyn came into work and looked in the legal imaging medical record (PACS) to see if images that were not sent on original date had been sent, they had not been. Rozalyn stated "I wanted to see if Debbie did the right thing and sent the images, proving that she was not a liar". Again, on 5/19/12[sic] Rozalyn stated "she went to the CT unit to see if the images were present". Rozalyn entered into a patient medical record for no reason on 2 separate occasions, thus creating a third HIPPA [sic] violation in three days.

(May 21, 2012 Performance Management Record at 1.)

{¶ 13} On May 24, 2012, appellees terminated appellant's employment. On the termination notice, the "description of behavior/situation & impact" states:

On 5-16-12 at 8:35 am Rosalyn Kenner assisted in the care of a patient who received a non contrast CT scan instead of a contrast enhanced CT scan. Rosalyn waited approximated 8 hours to report this incident to her supervisor. This delay in reporting was a violation of Radiology Reportable Events to Ohio Department of Heath policy, A400.003. The delayed reporting compromised the accuracy of the patient record and put the accuracy of the patient's diagnosis at risk. During this delay she admittedly discussed the incident with Ohiohealth staff outside of her care site, including naming staff members involved. The next day at 7:56 am, Rosalyn accessed this patient's examination in the OH PACS system. This access was not related to the care of this patient. She stated to her manager and a management witness that she did this "To understand if her coworker was a liar." On 5-18-12, Rosalyn admittedly viewed the patient's images on the CT scanner to determine if the images were still available to be sent to the PACS system. This was before being asked to send them later that day, around 12:30 pm, by her manager. This access was not related to the care of this patient. The manager's request to access the file was to ensure all images were sent to the PACS system and reported by the radiologists. Her actions regarding this incident are negligence of duty with a potentially serious impact on the organization including gross and/or willful disregard for safety. This is considered serious

misconduct    by    the    OhioHealth    Policy    Performance
Management, 702.100.

(May 24, 2012 Performance Management Record at 1.)  On the same day, appellees fired Johnson.  Appellees hired an African-American woman as a technologist.

{¶ 14} On February 1, 2013, appellant filed a complaint alleging that appellees discriminated against her based on race by terminating her employment in violation of R.C. 4112.02 and 4112.09.  To sustain the claim, appellant proffered Shoemaker as a similarly situated employee who was treated better by appellees.

{¶ 15} Shoemaker, who is Caucasian, is a technician in the CT scan unit who reported to the same supervisors as appellant.  In April 2012, Shoemaker scanned a patient but when she checked the images, she did not see contrast.  It is unclear whether Shoemaker was in the role of the computer person or the IV person at the time.  She checked the patient for signs of an "extravasation," a condition where the contrast injected into the patient's arm escapes the vein and fills the arm.  (Tr. Vol. [2] at 264.)  She found no signs of extravasation but immediately called the radiologist.  The radiologist checked the patient and the scans and also found no signs of extravasation.  At the direction of the radiologist, Shoemaker took a single additional picture and then the radiologist told Shoemaker to call the patient the next day to see how he was doing.  Shoemaker saved the patient's demographic sheet, which contained his name, address, telephone number, insurance information, date of birth, and partial social security number, put the sheet on her desk, and used that information to contact the patient the following day.  The patient reported symptoms of extravasation.  At that point, Shoemaker filled out paperwork to notify management of the extravasation incident.  Appellees did not discipline Shoemaker for this incident.  Taylor testified that he was aware that Shoemaker would have to access confidential patient information in order to contact the patient at home.  Nothing in the record shows that appellees were aware that Shoemaker retained a patient's contact demographic sheet on her desk.

{¶ 16} The trial court denied appellees' motion for summary judgment on the race discrimination claim, and the case proceeded to a two-week jury trial.  During trial, after appellant closed her case-in-chief, appellees moved for a directed verdict as to liability.  The trial court denied the motion.  Appellees presented its defense, asserting that

although the description of behavior stated in the termination notice includes multiple infractions, such as her failure to report, it ultimately terminated appellant's employment based on her access of confidential patient records for purposes other than patient care. Appellees additionally presented evidence that, around the summer of 2012, it investigated and eventually fired a Caucasian technologist employed in the CT scan unit for accessing confidential information in PACS.

{¶ 17} After the close of all evidence, appellees moved for a directed verdict regarding appellant's request for punitive damages; the trial court overruled the motion and conducted a separate trial on that issue. The jury returned a verdict for appellant in the amount of $230,304 in compensatory damages and $10,000 in punitive damages. The jury answered jury instructions finding that appellant proved that she and Shoemaker "dealt with the same supervisors, were subject to the same standards, and engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it," that Shoemaker was treated better than appellant, and that OhioHealth did not articulate a legitimate, non-discriminatory reason for appellant's termination. (Jury Instructions Question 1.) In line with a jury instructions prompt, the jury did not go on to answer whether appellant proved that OhioHealth's reason was a pretext for discrimination. On April 13, 2015, the trial court entered judgment for appellant.

{¶ 18} On May 10, 2015, appellees filed a motion for JNOV or, alternatively, a new trial. Appellant opposed the motion on June 5, 2015, and appellees replied on June 26, 2015. On October 1, 2015, the trial court entered a decision and entry granting appellees' motion for JNOV and alternative motion for new trial, vacating several judgment entries in favor of appellant, and entering final judgment in favor of appellees. In doing so, the trial court found that appellant and Shoemaker were not similarly situated as a matter of law due to the presence of differentiating or mitigating circumstances, that appellees articulated a legitimate, non-discriminatory reason for appellant's termination, and that appellant failed to produce any evidence that appellees' stated reason for her termination was a pretext for discrimination or that appellees did not have an honest belief in the non-discriminatory basis. Regarding the alternative motion for new trial, the trial court found

that the jury verdict was both contrary to law and against the manifest weight of the evidence.

{¶ 19} Appellant filed a timely appeal to this court.

## II.  ASSIGNMENTS OF ERROR

{¶ 20} Appellant presents five assignments of error:

1.  The lower court erred by granting Appellees' Motion for Judgment Notwithstanding the Verdict and Motion for New Trial by holding that Appellant did not present any evidence to prove the fourth prong of her prima facie case of race discrimination.

2.  The lower court erred by granting Appellees' Motion for Judgment Notwithstanding the Verdict and Motion for New Trial by holding that Appellee satisfied its burden of articulating a legitimate, nondiscriminatory reason for Appellant's termination from employment.

3.  The lower court erred by granting Appellees' Motion for Judgment Notwithstanding the Verdict and Motion for New Trial by holding that Appellant failed to prove that Appellee' s stated reason for her termination was a pretext for race discrimination and holding instead that Appellant failed to produce evidence that her race was the true reason that Appellee fired her.

4.  The lower court erred by granting Appellees' Motion for Judgment Notwithstanding the Verdict and Motion for New Trial by holding that Appellees held an "honest belief" upon which it made its employment decision to terminate Appellant's employment.

5.  The lower court erred by vacating the jury's award of punitive damages and the court's award of attorney's fees.

## III.  STANDARD OF REVIEW

{¶ 21} A motion for JNOV is governed by Civ.R. 50(B), which provides:

Whether or not a motion to direct a verdict has been made or overruled and not later than twenty-eight days after entry of judgment, a party may serve a motion to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with the party's motion; or if a verdict was not returned such party, within twenty-eight

days after the jury has been discharged, may serve a motion for judgment in accordance with the party's motion. A motion for a new trial may be joined with this motion, or a new trial may be prayed for in the alternative.

Unless otherwise provided by local rule or by order of the court, arguments in response to the motion shall be served within fourteen days after service of the motion, and a movant's reply may be served within seven days after service of the response to the motion.

If a verdict was returned, the court may allow the judgment to stand or may reopen the judgment. If the judgment is reopened, the court shall either order a new trial or direct the entry of judgment, but no judgment shall be rendered by the court on the ground that the verdict is against the weight of the evidence. If no verdict was returned the court may direct the entry of judgment or may order a new trial.

{¶ 22} The test applied by a trial court in ruling on a motion for JNOV is the same test to be applied on a motion for a directed verdict. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 25; *Posin v. A.B.C. Motor Court Hotel, Inc.*, 45 Ohio St.2d 271, 275 (1976). In reviewing a motion for JNOV, the evidence "must be construed most strongly in favor of the party against whom the motion is made, and, where there is substantial evidence to support his side of the case, upon which reasonable minds may reach different conclusions, the motion must be denied." *Osler v. Lorain*, 28 Ohio St.3d 345, 347 (1986), citing *Posin* at 275. "Neither the weight of the evidence nor the credibility of the witnesses is proper consideration for the trial court." *Smith v. Superior Prod., LLC*, 10th Dist. No. 13AP-690, 2014-Ohio-1961, ¶ 11, citing *Posin* at 275. Thus, "[a] motion for judgment notwithstanding the verdict is used to determine only one issue: whether the evidence is totally insufficient to support the verdict." *Harper v. Lefkowitz*, 10th Dist. No. 09AP-1090, 2010-Ohio-6527, ¶ 8. A ruling on a motion for JNOV is a question of law, reviewed de novo on appeal. *Eastley* at ¶ 25 (stating that in reviewing such motions, "the court must determine whether any evidence exists on every element of each claim or defense for which the party has the burden to go forward"); *Smith*.

{¶ 23} A motion for new trial under Civ.R. 59(A) provides that a new trial may be granted on several enumerated grounds or in the "sound discretion of the court for good cause shown." Civ.R. 59(A)(9). Pertinent to the grounds raised here, a new trial may be

granted where "[t]he judgment is not sustained by the weight of evidence" and where "[t]he judgment is contrary to law." Civ.R. 59(A)(6), (7). " 'Judgments supported by some competent, credible evidence going to all essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence.' " *Smith* at ¶ 57, quoting *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 280 (1978). The decision to grant or deny a motion for a new trial, pursuant to Civ.R. 59(A)(6), lies within the sound discretion of the trial court and will not be reversed absent an abuse of that discretion. *Smith* at ¶ 58; *Salvatore v. Findley*, 10th Dist. No. 07AP-793, 2008-Ohio-3294, ¶ 9. The term "abuse of discretion" connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). However, "[a] court reviewing a trial court's decision regarding a Civ.R. 59(A)(7) motion for a new trial must decide whether the trial court erred as a matter of law." *Gill v. Grafton Corr. Inst.*, 10th Dist. No. 10AP-1094, 2011-Ohio-4251, ¶ 36. *O'Day v. Webb*, 29 Ohio St.2d 215 (1972), syllabus.

## IV. DISCUSSION

### A. First, Second, Third, and Fourth Assignments of Error

{¶ 24} Appellant's first four assignments of error all challenge the ultimate issue of whether the trial court erred in granting appellees' motion for JNOV and alternative motion for new trial. As such, we will address these assignments of error together. *Jelinek v. Abbott Laboratories*, 164 Ohio App.3d 607, 2005-Ohio-5696, ¶ 34 (10th Dist.), *discretionary appeal not allowed*, 108 Ohio St.3d 1511, 2006-Ohio-1329.

#### 1. Analytical Framework

{¶ 25} Under Ohio law, it is "an unlawful discriminatory practice * * * [f]or any employer, because of the race * * * of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." R.C. 4112.02(A). Generally, Ohio courts reviewing discrimination claims under R.C. Chapter 4112 refer to federal case law interpreting Title VII of the Civil Rights Act of 1964. *Smith* at ¶ 13.

{¶ 26} To prevail in a race discrimination case, a plaintiff must prove discriminatory intent. *Mittler v. OhioHealth Corp.*, 10th Dist. No. 12AP-119, 2013-Ohio-1634, ¶ 44, *discretionary appeal not allowed*, 136 Ohio St.3d 1494, 2013-Ohio-4140. Absent direct evidence of an employer's discriminatory intent against a protected class, a plaintiff may establish discriminatory intent using the burden-shifting analytical framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), as adopted by the Supreme Court of Ohio in *Plumbers & Steamfitters Joint Apprenticeship Commt. v. Ohio Civil Rights Comm.*, 66 Ohio St.2d 192 (1981). *Williams v. Akron*, 107 Ohio St.3d 203, 2005-Ohio-6268, ¶ 9; *Boyd v. Ohio Dept. of Mental Health*, 10th Dist. No. 10AP-906, 2011-Ohio-3596, ¶ 25, *discretionary appeal not allowed*, 130 Ohio St.3d 1477, 2011-Ohio-6124. Neither party disputes that the *McDonnell Douglas* analytical framework applies to this case.

{¶ 27} The *McDonnell Douglas* analytical framework involves three basic steps. *McDonnell Douglas* at 807; *Plumbers* at 197-98; *Williams* at ¶ 9-14. Under the first step, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. *McDonnell Douglas* at 802. In a case alleging race-based termination from employment, the plaintiff must prove by a preponderance of the evidence that: (1) she is a member of a protected class, (2) she was terminated from employment, (3) she was qualified for the position in question, and (4) either she was replaced by someone outside the protected class or a non-protected similarly situated person was treated better. *Boyd* at ¶ 26, citing *McDonnell Douglas* at 802 and *Samadder v. DMF of Ohio, Inc.*, 154 Ohio App.3d 770, 2003-Ohio-5340, ¶ 35; *Waddell v. Roxane Laboratories*, 10th Dist. No. 03AP-558, 2004-Ohio-2499, ¶ 19. "The burden of establishing a prima facie case of disparate treatment is not onerous." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981). "Establishing a prima facie case 'creates a presumption that the employer unlawfully discriminated against the employee.' " *Williams* at ¶ 11, quoting *Burdine* at 254.

{¶ 28} Under the second step of the *McDonnell Douglas* analytical framework, if a plaintiff established a prima facie case, the burden shifts to the employer to rebut the presumption of discrimination by presenting evidence of some legitimate, non-discriminatory reason for its action. *Williams* at ¶ 12; *McDonnell Douglas* at 802. "The

[employer's] explanation of its legitimate reasons must be clear and reasonably specific" in order to allow a plaintiff a full and fair opportunity to demonstrate pretext. *Burdine* at 258. The employer's burden is one of production, not of persuasion. *Boyd* at ¶ 27. An employer meets its burden if it "introduce[s] evidence which, *taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action." (Emphasis sic.) *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993). *See also Burdine* at 254 ("The defendant need not persuade the court that it was actually motivated by the proffered reasons."). If the employer articulates a legitimate, non-discriminatory reason, "the presumption created by the prima facie case drops from the case because the employer's evidence has rebutted the presumption of discrimination." *Williams* at ¶ 12.

{¶ 29} Under the third step, if the employer carries its burden, then the plaintiff must demonstrate, by a preponderance of the evidence, that the reason the employer offered for taking the adverse employment action is actually a pretext for discrimination. *McDonnell Douglas* at 807; *Plumbers* at 198. To do so, a plaintiff must prove either " ' "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [her] discharge, or (3) that they were insufficient to motivate discharge." ' " *Mittler* at ¶ 44, quoting *Sweet v. Abbott Foods, Inc.*, 10th Dist. No. 04AP-1145, 2005-Ohio-6880, ¶ 34, quoting *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir.1994). *Warden v. Ohio Dept. of Natural Resources*, 10th Dist. No. 13AP-137, 2014-Ohio-35, ¶ 31. " 'Mere conjecture that [the] employer's explanation is a pretext for intentional discrimination' " is an insufficient basis to establish pretext. *Olive v. Columbia/HCA Healthcare Corp.*, 8th Dist. No. 75249 (Mar. 9, 2000), quoting *Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir.1988).

{¶ 30} The burden on the plaintiff under the third step "merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination." *Burdine* at 256. Thus, to establish that a proffered reason is pretext for discrimination, the plaintiff must show "both that the reason was false, *and* that discrimination was the real reason." (Emphasis sic.) *St. Mary's Honor Ctr.* at 515; *Boyd* at ¶ 28. Thus, "if an employer honestly believes in the legitimate,

nondiscriminatory reason that it relied on in making its employment decision, then the employer lacks the necessary discriminatory intent." *Smith v. Ohio Dept. of Pub. Safety*, 10th Dist. No. 12AP-1073, 2013-Ohio-4210, ¶ 78, citing *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir.1998). In order for an employer to claim an honest belief in its proffered reason, the employer must establish its reasonable reliance on particularized facts that were before it at the time it made the adverse employment decision. *Id.*

### 2. Motion for JNOV

{¶ 31} As a preliminary issue, appellant repeatedly argues that a motion for JNOV is improper following the trial court's earlier denial of appellees' motion for directed verdict and as an inappropriate displacement of the jury's verdict. Because Civ.R. 50(B) expressly provides a mechanism to obtain a judgment despite the jury verdict "[w]hether or not a motion to direct a verdict has been made or overruled," we disagree and will proceed to examine the merits of appellant's appeal of that decision.

{¶ 32} For the first step of the *McDonnell Douglas* test involving appellant's burden to set forth sufficient evidence of her prima facie case, appellees do not dispute that, as an African-American, appellant is a member of a protected group, her termination is sufficient as an adverse employment event, and that she was qualified for the position. Thus, the first three elements of appellant's prima facie case are met, and only one issue, whether appellant presented evidence sufficient on the fourth element of the prima facie case, is in dispute on appeal.[1]

{¶ 33} To meet her burden on the fourth prong, appellant seeks to demonstrate that Shoemaker, a Caucasian technologist not involved in the May 2012 incident, is similarly situated to appellant but treated better by appellees. Where the plaintiff contends her employer treated a non-protected similarly situated person better, the individual with whom the plaintiff seeks to compare her treatment must be similar in all relevant respects. *Ames v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 14AP-119, 2014-Ohio-4774, ¶ 42. Courts evaluate whether the proffered individual dealt with the same supervisor, were subject to the same standards, and engaged in the same conduct

---

[1] Appellant does not argue against reviewing the merits of the prima facie case in resolving the JNOV/new trial motion.

without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it. *Mittler* at ¶ 23. A person is not similarly situated unless the conduct engaged by the proffered individual is of "comparable seriousness" to the conduct that predicted the employee/plaintiff's termination. *Ames* at ¶ 43-44.

{¶ 34} Here, appellees do not contest that appellant and Shoemaker performed the same job duties, were subject to the same standards, and reported to the same supervisors. Regarding the similarity of the conduct of the two women, in her memorandum in opposition to the trial court, appellant contended that she put forth evidence that Shoemaker accessed confidential patient information for patient care, that appellees were aware of such access, and that appellees did not terminate or otherwise discipline Shoemaker.

{¶ 35} The conduct of appellant and Shoemaker is distinguishable factually. Shoemaker accessed a contact information sheet from the patient's medical record to comply with a direct order from the radiologist to contact a patient, while appellant accessed the patient's scanned images both on the CT scan workstation and in the PACS system on her own volition, in part for what she alleged was her job duty related to patient care and in part for what she admitted to be the unauthorized purpose of seeing if a co-worker lied, out of concern that person would get away with the incident. Appellant admitted to management she accessed confidential information at least in part to determine if a co-worker lied while the record shows no indication that Shoemaker accessed confidential information for an improper purpose or discussed such improper purpose with management.

{¶ 36} However, many of these differences implicate both the weight of evidence and a determination on the ultimate question of whether appellant's access was or was not authorized as patient care. Considering that we may not weigh the evidence, that we must view the evidence "strongly in favor" of appellant, and that appellant's burden under the prima facie stage is "not onerous," on these facts we cannot say definitively that appellant did not provide sufficient evidence that Shoemaker and appellant were not similarly situated as a matter of law. *Osler* at 347, citing *Posin* at 275; *Burdine* at 253.

{¶ 37} Having concluded that appellant met her burden in establishing the prima facie case of racial discrimination, we proceed to the second step of the *McDonnell Douglas* framework to determine whether appellees met its burden in articulating a legitimate, non-discriminatory reason for terminating appellant.

{¶ 38} In its motion for JNOV, appellees contended that it terminated appellant from employment because she improperly accessed a patient's confidential medical record for a reason unrelated to patient care, in violation of OhioHealth's policies, and that this reason, if taken as true, is clearly a legitimate, non-discriminatory reason. Appellant contends that appellees' articulated reason was not "clear and reasonably specific" as required by *Burdine* because at trial appellee "abandoned" several reasons listed in their termination notice and that the "jury was in the best position to judge the weight and credibility of [appellees'] testimony" regarding the reason for termination. (Appellant's Brief at 37, 39, 48; *see also* June 5, 2015 Memo. in Opp. to Mot. For JNOV at 23, 26.)

{¶ 39} Here, several supervisors testified that appellees terminated appellant from employment because she accessed a patient's confidential medical record for a reason unrelated to patient care, in violation of OhioHealth's policies. Appellees documented this conduct in the description of behavior section of appellant's termination notice. It is undisputed that unauthorized access of patient confidential information is a ground for termination under appellees' policies. Appellant admitted that accessing confidential information to see if a co-worker lied is an unauthorized purpose. Furthermore, contrary to appellant's argument, the jury was not permitted to judge the weight and credibility of the testimony regarding appellees' stated reason for firing appellant. *Boyd* at ¶ 27. Rather, the jury must determine whether, if taken as true, appellees' stated reason for firing appellant would permit the conclusion that it possessed a non-discriminatory reason for terminating appellant's employment. *Id.*

{¶ 40} After an independent review of the matter, we find that appellees' articulated reason was clear and reasonably specific, allowing appellant a full and fair opportunity to demonstrate pretext, and that if taken as true, appellees' stated reason for firing appellant would permit the conclusion that it possessed a non-discriminatory reason for terminating appellant's employment as a matter of law. As such, appellees met

its burden of producing a legitimate, non-discriminatory reason for discharging appellant. *St. Mary's Honor Ctr.* at 509.

{¶ 41} Having found that appellees met its burden of articulating a legitimate, non-discriminatory reason for discharging appellant, under the third step of the *McDonnell Douglas* test, appellant must carry her burden in demonstrating by a preponderance of the evidence that the reason appellees offered for her termination is actually a pretext for discrimination. Ultimately, we must determine whether appellant produced sufficient evidence that she has been the victim of intentional discrimination. *Burdine* at 256.

{¶ 42} In its motion for JNOV, appellees argued that appellant failed to provide sufficient evidence of pretext under all three methods of proving pretext—that appellees' reason had no basis in fact, that appellees' reason did not actually motivate her termination, or that appellees' reason was insufficient to warrant termination—and that appellant failed to provide evidence that race was the real reason she was fired. Alternatively, appellees argued that appellant failed to show that appellees did not have an honest belief in its stated reason for terminating appellant's employment.

{¶ 43} In appellant's opposition to the motion for JNOV, she contends that appellees' pretext arguments should be rejected because the jury found that appellees did not offer a legitimate, non-discriminatory reason for terminating appellant's employment. Appellant believes that if the "court were to consider [appellees'] pretext arguments, the Court would have to substitute its judgment in place of the jury." (June 5, 2015 Memo. in Opp. to Mot. for JNOV at 27.) We disagree.

{¶ 44} As discussed earlier in this opinion, a motion for judgment notwithstanding the verdict is a mechanism to obtain judgment despite the jury verdict. Civ.R. 50(B). Because we concluded that appellees articulated a legitimate, non-discriminatory reason as a matter of law, the next step of the *McDonnell Douglas* framework requires an assessment of whether appellant showed the employer's reason was a pretext for discrimination and that appellees fired appellant due to her race. *Williams* at ¶ 19; *Eastley* at ¶ 25 (requiring court to examine the sufficiency of the evidence "on every element of each claim or defense for which the party has the burden to go forward"). As a motion for JNOV challenges the sufficiency of the evidence, a

question of law, we are not usurping the role of the jury in addressing pretext in this context. *Id.*

{¶ 45} We note that appellant raises several additional arguments on appeal regarding the sufficiency of evidence of pretext and asserts she did argue these positions in opposing appellees' motion for JNOV. Our review of the briefs to the trial court show that appellant specifically asked the court to determine the issue of pretext for the motion for JNOV for the one reason stated above, concerning displacing the jury verdict on appellees' legitimate, non-discriminatory reason. As such, we decline to address appellant's arguments raised for the first time on appeal.[2] *Niehaus v. The Columbus Maennerchor*, 10th Dist. No. 07AP-1024, 2008-Ohio-4067, ¶ 55 ("It is well-settled that a party may not raise an issue on appeal that was not initially raised before the trial court."); *C4 Polymers, Inc. v. Huntington Natl. Bank*, 8th Dist. No. 102142, 2015-Ohio-3475, ¶ 47 (applying waiver in context of appellate review of a motion for JNOV).

{¶ 46} Having reviewed de novo the record and motions in favor of and in opposition to JNOV, we find that appellant's argument regarding pretext lacks merit and that the evidence presented in this case, construed strongly in favor of appellant, is insufficient to establish that racial discrimination was the real reason appellees terminated appellant and that appellees did not have an honest belief in the proffered non-discriminatory reason for its adverse employment action. *Boyd* at ¶ 28; *Smith*, 2013-Ohio-4210 at ¶ 78. Considering all the above, on the facts of this case, the evidence is legally insufficient to prove that appellees' stated reason for firing appellant was a pretext for racial discrimination.

{¶ 47} Viewed in total, although appellant did not fail to meet her prima facie burden as a matter of law, appellees met its burden of articulating a legitimate, non-discriminatory reason for terminating appellant's employment, and appellant failed to provide sufficient evidence that appellees' stated reason was a pretext for racial discrimination—that she was fired because of her race. Therefore, the evidence is

---

[2] In her briefs on appeal, appellant stated she argued pretext in her memorandum in opposition to JNOV on pages 61-63. We are unable to locate these pages (the memorandum in opposition consists of 41 pages total). We recognize that appellant presented arguments regarding pretext in her memorandum in opposition to the motion for new trial and will address those arguments in the new trial section of this opinion, below.

insufficient to support the verdict under the *McDonnell Douglas* framework, and judgment notwithstanding the verdict in favor of appellees is appropriate. *Eastley* at ¶ 25; Civ.R. 50(B).

### 3. Alternative Motion for New Trial

{¶ 48} Civ.R. 50(C) provides that if the motion for JNOV provided for in Civ.R. 50(B) is granted, then the court shall rule on the motion for a new trial. Given that we affirm the trial court's decision to grant appellees' motion for JNOV in this case, "we find it necessary to address the issue of whether the trial court erred in conditionally granting a new trial." *Jelinek* at ¶ 43.

{¶ 49} In its motion for new trial to the trial court, appellees argued that the judgment is not sustained by the weight of the evidence, pursuant to Civ.R. 59(A)(6), and is contrary to law pursuant to Civ.R. 59(A)(7). The trial court first determined that the judgment is contrary to law because appellees articulated a legitimate, non-discriminatory reason for firing appellant. As previously concluded in this decision, appellees clearly, and in a reasonably specific manner, stated that it terminated appellant based on her access of confidential patient medical records for a reason unrelated to patient care in violation of appellees' policies. We find appellees met its burden of production in articulating a legitimate, non-discriminatory reason for terminating appellant's employment and that the jury's conclusion to the contrary is contrary to law. As a result, the trial court did not err as a matter of law in granting appellees' motion for new trial under Civ.R. 59(A)(7).

{¶ 50} The trial court next determined that the judgment is against the weight of the evidence, holding that appellant failed to establish that she is similarly situated to Shoemaker, that appellees produced a legitimate, non-discriminatory reason for firing appellant, and that appellant produced no trial evidence establishing appellees terminated her based on her race.

{¶ 51} First, viewing the weight of the evidence, we agree with the trial court's assessment that Shoemaker is not similarly situated to appellant. Shoemaker acted under the direct orders of a physician and no record evidence shows either that she accessed confidential information for a purpose other than patient care or that she discussed such an unauthorized purpose with her supervisors. Conversely, appellant discussed with her

supervisors that she accessed a patient's confidential medical records, at least in part, to see if a co-worker lied because she feared this co-worker was attempting to get away with the over-radiation incident. Appellant's contentions that she accessed the records for patient care was contradicted by her admission of inaction in telling others that the file remained incomplete and inaction in pursing the missing images and remedying the file. Considering the above, we find that no competent, credible evidence establishes that Shoemaker engaged in the same conduct as appellant, in all relevant respects, without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it. *Mittler* at ¶ 23; *Ames* at ¶ 42. Thus, the manifest weight of the evidence does not support a judgment in favor of appellant on her prima facie case.

{¶ 52} Second, as previously discussed in this opinion, we agree with the trial court that appellees produced a legitimate, non-discriminatory reason for firing appellant. It is undisputed that accessing confidential medical records for an unauthorized purpose is a terminable offense and that checking to see if a co-worker is lying is an unauthorized purpose.

{¶ 53} Third, the trial court did not abuse its discretion in concluding that appellant produced no evidence to establish that appellees' stated reason is a pretext for racial discrimination. Appellant argues that the trial court erred by failing to find that appellees' stated reason had no basis in fact and was false. Specifically, in her memorandum in opposition to new trial, appellant cites evidence allegedly establishing that her supervisors never told her not to stop working on the patient at issue, that appellees falsified the termination notice by omitting her contention that she also accessed the confidential information for patient care, and that appellees' reason for firing her was based on "shifting testimony."[3] (June 5, 2015 Memo. in Opp. to Mot. For JNOV at 39.)

{¶ 54} For purposes of argument, even if appellant's statements that appellees did not tell her to cease working on the patient's case or that appellees omitted information about her patient-care contention are true, these points do not prove that appellees'

---

[3] Appellant did not argue that appellees' better treatment of a similarly situated employee is evidence of pretext either to the trial court or on appeal.

reason has no basis in fact or are false. Appellant admitted that appellees told her that she was removed from the situation on the morning of May 17, admitted that she accessed the confidential files to, at least in part, see if a co-worker was lying out of concern that a co-worker would get away with the incident, and admitted that she did not notify anyone of her alleged continued concern over the incomplete status of the patient records.

{¶ 55} Furthermore, while it is well-established that " '[a]n employer's changing rationale for making an adverse employment decision can be evidence of pretext,' " no such changing rationale is present here. *Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 592 (6th Cir.2002), quoting *Thurman v. Yellow Freight Sys.*, 90 F.3d 1160, 1167 (6th Cir.1996), *am. on other grounds*, 97 F.3d 833 (6th Cir.1997). In this case, the termination notice includes in its "description of behavior" a listing of multiple instances of conduct. (May 24, 2012 Performance Management Record at 1.) At trial, appellees testified that one of those reasons was dispositive to the termination decision. Our review of the record shows that appellees did not change its reason for terminating appellant, and, as such, this is not evidence that appellees' proffered reason is a pretext for racial discrimination.

{¶ 56} Overall, we find that appellant did not provide any competent, credible evidence that appellees' legitimate, non-discriminatory reason was false, that these reasons did not actually motivate its decision to terminate appellant's employment, or that its reasons were insufficient to motivate termination. *Mittler* at ¶ 54. Because the record does not contain some competent and credible evidence going to each element of appellant's case, the judgment was against the manifest weight of the evidence. *Smith*, 2014-Ohio-1961 at ¶ 57. As such, the trial court did not abuse its discretion in granting appellees' new trial in the alternative under Civ.R. 59(A)(6). *Id.*; *Wasserstrom v. Battelle Mem. Inst.*, 10th Dist. No. 15AP-849, 2016-Ohio-7943, ¶ 47.

{¶ 57} Accordingly, considering all the above, appellant's first, second, third, and fourth assignments of error are overruled.

### B. Fifth Assignment of Error

{¶ 58} Under the fifth assignment of error, appellant contends that the trial court erred by vacating the jury's award of punitive damages and the court's award of attorney fees. The resolution of appellant's first four assignments of error, above, render her fifth assignment of error moot. App.R. 12(A)(c).

{¶ 59} Accordingly, the fifth assignment of error is rendered moot.

## V. CONCLUSION

{¶ 60} Having overruled appellant's first, second, third, and fourth assignments of error and rendering appellant's fifth assignment of error moot, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

LUPER SCHUSTER, concurs.
HORTON, J., dissents.

HORTON, J., dissenting.

{¶ 61} I respectfully dissent. I do agree with the majority in holding that Kenner was able to prove the similarly-situated prong of her prima facie case. Many of the "differentiating or mitigating circumstances that would distinguish [the employees'] conduct" provided by OhioHealth depend on its reading of events and its ultimate conclusion that the access for which Kenner was terminated was unauthorized and not for patient care. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir.1998). OhioHealth's position imports issues that concern the employer's ultimate reasons for termination into the prima facie case, and the factfinder's analysis of the proffered reasons should occur at the pretext stage and is highly dependent on witness credibility. "Evidence that similarly situated non-class-members were treated differently from plaintiff does not enter the inquiry until its third and final stage, when the plaintiff is given an opportunity to demonstrate that the employer's stated reason for its employment decision is merely a pretext for discrimination." *Williams v. Akron*, 107 Ohio St.3d 203, 2005-Ohio-6268, ¶ 49 (Resnick, J., dissenting). While some might consider Kenner's prima facie case marginal, the standard of review on appeal of a decision granting judgment notwithstanding the verdict ("JNOV") requires considering the evidence "strongly in favor of" Kenner. Civ.R. 50(A).

{¶ 62} I also agree that OhioHealth *articulated* a legitimate, nondiscriminatory reason for terminating Kenner. However, a review of the interrogatories answered by the jury reveals that the jury lost its way when it reached the second stage of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), as adopted by the Supreme Court of Ohio in *Plumbers & Steamfitters Joint Apprenticeship Commt. v. Ohio Civil Rights Comm.*, 66

Ohio St.2d 192 (1981), inquiry and answered "no" to the following question: "Do you find that OhioHealth articulated a legitimate, non-discriminatory reason or reasons for Ms. Kenner's termination?"   (Jury Interrogs., Question No. 3.)   Numerous supervisors testified that Kenner had been discharged for unauthorized access to patient records in violation of OhioHealth policy.   OhioHealth introduced documentary evidence on the issue such as Kenner's termination notice that referenced that policy violation, as well as a violation of the radiology reportable events policy. Given this evidence, reasonable minds can come but to one conclusion: OhioHealth fulfilled its burden of *production*.

{¶ 63} The jury's response, however, was understandable. The jury instructions made no distinction between the burden of *persuasion* applicable at the prima facie and pretext stages and the burden of *production* at the second stage of the analysis. For example, Jury Instruction No. 10, titled "Legitimate, Non-Discriminatory Reason and Pretext," stated the following:

> If you find that Ms. Shoemaker was similarly situated to Ms. Kenner and you find that she was treated better than Ms. Kenner, you then must consider whether OhioHealth has articulated a legitimate non-discriminatory reason for Ms. Kenner's termination. OhioHealth has asserted that it terminated Ms. Kenner because she improperly accessed a patient's private medical information for a reason unrelated to patient care.
>
> If you find that OhioHealth has articulated a legitimate non-discriminatory reason for Ms. Kenner's termination, Ms. Kenner must establish by the greater weight of the evidence that this reason is a pretext for race discrimination. To prove pretext, Ms. Kenner must establish by the greater weight of the evidence that OhioHealth's reason for her termination has no basis in fact, did not actually motivate OhioHealth's decision, or was insufficient to warrant termination and the real reason for her termination was race discrimination. Ms. Kenner claims that OhioHealth's legitimate, non-discriminatory reason for terminating her employment is unworthy of credibility and pretext for discrimination.

{¶ 64} Even though this instruction accurately described OhioHealth's burden as having to "articulate" a reason, it nevertheless invited the jury to prematurely consider whether it believed the proffered reason by describing it as the reason that OhioHealth

"asserted." The instructions did not clarify that in this context "articulate" meant no more than provide a facially valid reason for the termination and that the jury should reserve questions of believability until its consideration of pretext. Because the jury instructions emphasized that its members were "the judges of the facts, the believability of the witnesses, and the weight of the evidence," they logically performed those tasks when they answered the question asking whether OhioHealth had articulated a legitimate, nondiscriminatory reason for terminating Kenner. (Jury Instruction No. 4.) It is apparent that the jury answered "no" to the question because they detected, at a minimum, some illegitimacy in OhioHealth's proffered reason, not because OhioHealth failed to fulfill its burden of production.

{¶ 65} Elsewhere as well, the instructions appeared to pit Kenner's prima facie case only against OhioHealth's legitimate, nondiscriminatory reason suggesting that credibility should guide which party prevailed. For example, Jury Instruction No. 7, "Outline of Claims and Defenses," stated the following:

> Kenner alleges that [OhioHealth] discriminated against her in violation of Ohio law by terminating her employment because of her race (African-American).
>
> OhioHealth denies Ms. Kenner's claim that it terminated her because of her race. OhioHealth asserts that its decision to terminate Ms. Kenner's employment was for a legitimate, non-discriminatory reason.
>
> It is your responsibility to decide whether Ms. Kenner has proven by the greater weight of the evidence that she was terminated because of her race.

{¶ 66} Of course, even if the jury had been properly instructed on the burden of production, the *McDonnell Douglas* analysis is notoriously confusing and such an instruction would also have carried a high risk of error. *See, e.g.*, *Brown v. Packaging Corp. of Am.*, 338 F.3d 586, 593 (6th Cir.2003) (holding that, while not reversible error, it is "normally inappropriate to instruct the jury on the *McDonnell Douglas* analysis"); *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1011 (1st Cir.1979) (observing that "the meaning of the requirement that the defendant 'Articulate a legitimate nondiscriminatory reason' for the plaintiff's discharge have caused no little difficulty among courts"). The comment to

Ohio's Civil Jury Instructions discourages any mention of the "legal definitions of the burdens of persuasion and production and how they shift under McDonnell Douglas," in favor of a "clear and preferable" instruction describing the plaintiff's burden to prove the ultimate fact of discrimination. *Ohio Jury Instructions*, CV 533.03 (Rev. Mar. 22, 2003).

{¶ 67} Ideally, the trial court would have omitted any mention of the first two stages of the *McDonnell Douglas* analysis in the jury instructions. The record reflects that other than a disagreement over the instruction on the honest belief doctrine, "the parties were in agreement as to everything" the instructions stated. (Oct. 27-28, 2014 Tr. Vol. 6 at 8-9.) Kenner's attorney appears to have been operating under the mistaken assumption that the mere production of a legitimate, nondiscriminatory reason requires convincing the jury that the reason is true, as even her briefing on appeal repeatedly asserts this legally erroneous position. (Appellant's Brief at 39-40, asserting that the trial court erred in finding that OhioHealth articulated a legitimate, nondiscriminatory reason because "the jury was not required to believe Mr. Partridge"; Reply Brief at 6-7.) For its part, OhioHealth apparently could not concede its position that Kenner had failed to make a prima facie case, even though its summary judgment motion, as well as a motion for reconsideration, had been overruled. Confident that the jury would not find that Kenner had made her prima facie case, it agreed to a set of jury instructions larded with *McDonnell Douglas* jargon. The tale is a cautionary one.

{¶ 68} In spite of these errors, I believe it is abundantly clear that the jury considered pretext. While OhioHealth also clearly fulfilled its burden to *produce* a legitimate, nondiscriminatory reason for terminating Kenner, the jury's answer indicates that it did not believe that the reasons were legitimate or nondiscriminatory. It applied a non-legal, common sense understanding of the question: did OhioHealth articulate a legitimate, nondiscriminatory reason? And, do you believe what you heard? Is this reason legitimate? Doing so, the jury did ultimately find that OhioHealth (although providing a nondiscriminatory reason to terminate Kenner) did, in fact, intentionally discriminate against Kenner. The jury was fully instructed on pretext, as well as the honest belief doctrine. Nevertheless, the jury's answer indicated that it believed "*both* that the reason was false, *and* that discrimination was the real reason." (Emphasis sic.) *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993), citing *Texas Dept. of Community Affairs v.*

*Burdine*, 450 U.S. 248, 253 (1981).  This conclusion is supported by the fact that the jury ultimately awarded not only compensatory damages to Kenner, but punitive damages as well. The award of punitive damages should not be underestimated.

{¶ 69} When reasonable minds could find in favor of the nonmoving party facing a motion for JNOV on a determinative issue, the motion must be denied.  *Posin v. A.B.C. Motor Court Hotel, Inc.*, 45 Ohio St.2d 271, 275 (1976).  Reasonable minds could have disbelieved OhioHealth's reasons for terminating Kenner because it initially gave multiple reasons for terminating her, yet later said only allegedly improper access to patient records was the actual reason. Furthermore, reasonable minds could infer that discrimination was the real reason because OhioHealth treated a similarly-situated member of an unprotected class better than Kenner.

{¶ 70} For the foregoing reasons, I believe that the jury did, in fact, consider pretext and found in Kenner's favor.  Nevertheless, the majority has substituted the jury's verdict with its own. Consequently, I believe the majority errs with an outcome-determinative assessment when the only discussion of pretext is that Kenner's "argument regarding pretext lacks merit and that the evidence presented in this case, construed strongly in favor of appellant, is insufficient to establish that racial discrimination was the real reason" for firing her. (Majority Decision at ¶ 46.) After weeks of testimony and deliberation, the majority has unnecessarily replaced the jury's deliberation with a casual statement. Although I do not believe that the majority should even have reached these issues given the errors in the jury instructions, I would at least remand the case for a new trial under Civ.R. 59(A)(6).  For these reasons, I respectfully dissent.

_____