[Cite as *Tatarunas v. Progressive Cas. Ins. Co.*, 2025-Ohio-4372.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

VIDAS TATARUNAS,                         :

      Plaintiff-Appellant,        :

                                     No. 114440

      v.                          :

PROGRESSIVE CASUALTY              :
INSURANCE CO., ET AL.,

                                  :

      Defendants-Appellees.

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** September 18, 2025

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-23-980169

---

### *Appearances:*

Michael T. Conway and Company and Michael Terrence Conway, *for appellant*.

Jackson Lewis, P.C., Patrick O. Peters, and Jacob S. Kinder, *for appellees*.

MICHELLE J. SHEEHAN, P.J.:

{¶ 1} This is a sex and race discrimination case. Plaintiff-appellant Vidas Tatarunas ("Tatarunas") worked for defendant-appellee Progressive Casualty

Insurance Co. ("Progressive") as an information technology ("IT") manager. Tatarunas is a white male and alleges that his employment was unlawfully terminated on account of his race and sex. He filed a complaint against Progressive alleging race discrimination, sex discrimination, intentional infliction of emotional distress, breach of contract, and wrongful termination in violation of public policy. The trial court ultimately granted summary judgment in favor of Progressive. Tatarunas appeals the trial court's judgment. Since there are no genuine issues of material fact to support Tatarunas's claims, we affirm the trial court's judgment granting summary judgment in favor of Progressive.

## Factual Background

{¶ 2} Tatarunas worked for Progressive from April 2013 through June 2021 as an IT manager. Progressive is an insurance company headquartered in Cuyahoga County, Ohio. One of Tatarunas's duties as an IT manager included interviewing potential candidates for associate manager positions within the company.

### Brian Jackson's Interview

{¶ 3} In the spring of 2021, Tatarunas interviewed Brian Jackson ("Jackson") for an associate manager position in the company. Jackson began working for the company in September 2014. Jackson is a male of mixed-race consisting of Caucasian, Cherokee, and African-American heritage. In 2021 Jackson applied for an associate manager position with the company. Rebecca Simpson ("Simpson"), who was the hiring manager, described this position as the "entry level to the project management job family at Progressive." Simpson explained that the

interview process required prospective candidates to complete two rounds of interviews. The first round included interviews with two managers, and the second round of interviews were with two other managers. Jackson was scheduled to interview with Tatarunas and Simpson, separately, in the first round of interviews.

{¶ 4} On April 29, 2021, Tatarunas interviewed Jackson. Following the interview, Tatarunas emailed Jackson information concerning a project management professional training course. On May 1, 2021, Jackson sent an email to Tatarunas, Simpson, and Kelly Davis ("Davis") (an IT recruiting supervisor with Progressive). In the email, Jackson stated that the "interview with [Tatarunas] was the most unprofessionally conducted interview of my entire career." Jackson explained that Tatarunas opened the interview by giving Jackson advice that Tatarunas said he had given his son. Tatarunas then told Jackson his son did not get the job. Jackson also stated that Tatarunas commented on the picture that Jackson had attached to his resume and stated, "[I]f your [sic] are good looking might as well show it off." Jackson also stated that Tatarunas told him during the interview that Tatarunas hated that Progressive made him take notes during the interview process. Jackson also requested that he wanted "the unprofessional and bias manner in which he was spoken to documented." Tatarunas responded to Jackson's email and apologized to Jackson if he had offended him and noted that he would take into consideration Jackson's feedback.

{¶ 5} On May 3, 2021, Jackson sent another email to Tatarunas, Simpson, and Davis. The email was addressed to "Vidas & Team" and stated, in relevant part,

"I feel strongly that this entire team could benefit greatly from working to understand biases and how they can impact leaders and thus employees if left unconscious and thus unchallenged . . . Diversity of thought is a business imperative, for innovation to exist." Jackson further stated, "My experience with this hiring process has lead [sic] me to the conclusion that there is a [sic] urgent need for real Diversity and Inclusion work within this part of the IT PM organization."

**Investigation**

{¶ 6} An investigation was conducted with respect to Jackson's complaint to determine whether Tatarunas's actions violated Progressive's code of conduct. Marlene Lauer ("Lauer"), an HR consultant at Progressive, conducted the investigation. After conducting multiple interviews and reviewing multiple documents, the investigation concluded "that there were no findings to support a biased interview for [Jackson.]"

{¶ 7} However, the investigation did purport to reveal other instances of unprofessional behavior by Tatarunas, such as Tatarunas's giving Jackson conflicting direction concerning the role for which he was interviewing. With respect to this point, the report noted "[t]his demonstrated a lack of awareness and appropriate communication. This is consistent with prior coaching and disciplinary warnings [Tatarunas] received in the past." The investigation also revealed that Tatarunas had received a pre-interview confirmation email from a separate, external candidate that included a Lithuanian phrase for "thanks" to which Tatarunas responded to the candidate: "butt kisser. Butt I like it. See you then!!"

**{¶ 8}** The investigative report notes that Tatarunas "has received 3 separate warnings within 5 years, all with a similar theme of communication and leadership behaviors that don't meet what is expected of a manager at Progressive."

**Disciplinary History**

**{¶ 9}** Throughout his tenure at Progressive, Tatarunas had a documented disciplinary history where he was disciplined three separate times. Progressive introduced the following disciplinary history concerning Tatarunas.

### 1. August 8, 2016 Documented Verbal Warning

**{¶ 10}** Tatarunas was first issued a verbal warning on August 8, 2016. The documented warning provided, in relevant part, that Tatarunas has "some leadership behaviors that need improvement, specifically a lack of composure, inappropriate escalation, and not dealing with conflict with a minimum amount of noise." The warning was in relation to a recruiting decision that Tatarunas disagreed with that resulted "in an aggressive conversation with a peer manager, which caused her to feel demeaned." The warning indicated that his performance would be monitored for 90 days and that "[a]ny further unacceptable behavior of the type described above will result in further disciplinary action, up to and including termination of your employment."

**{¶ 11}** A progress report was issued at the conclusion of the 90-day monitoring period. The report noted that Tatarunas's behavior had improved but listed two additional situations that occurred within the 90-day monitoring period

that resulted in the monitoring period to be extended until January 8, 2017. This warning and monitoring period was closed on January 11, 2017.

### 2. August 30, 2017 Written Warning

{¶ 12} On August 30, 2017, Tatarunas was issued a written warning stating that Tatarunas has "leadership and communication behaviors that need improvement, specifically a lack of organizational awareness and appropriate communication and escalation approaches. This feedback is not new and has been documented in prior documents and performance evaluations." The warning listed numerous incidents concerning Tatarunas's purported poor communication skills. Tatarunas was again placed on a 90-day monitoring period, with the warning that "[a]ny further unacceptable behavior of the type described above will result in further disciplinary action, up to and including termination of your employment." His monitoring period concluded on December 19, 2017.

### 3. January 30, 2018 Written Warning

{¶ 13} Tatarunas received another written warning on January 30, 2018, noting that Tatarunas has "leadership and communication behaviors that need improvement, specifically a lack of organizational awareness and communication." Tatarunas was advised that he "must exhibit behaviors in which you keep [his] emotions in check, escalate information appropriately, and clarify the intent, apply communication filters to better understand the receiving audience, and build organizational awareness to foster partnership and credibility." The warning further stated, "You are damaging your credibility and the credibility of the EPMO with our

peer organizations." Tatarunas was again monitored. This monitoring period concluded on June 22, 2018.

**Termination**

{¶ 14} Carly Sherrer is an IT group manager for Progressive. She testified during deposition that she ultimately made the decision to terminate Tatarunas's employment. Sherrer explained that Tatarunas "had shown a pattern of making errors in judgment, and the last instance was one that I discussed with HR and with my senior managers. As a result, we felt like there was a risk keeping [Tatarunas] in the position he was in." Sherrer elaborated that Tatarunas "could put Progressive in a bad legal position based on how he was handling information and interviews." She also noted that "[t]he company took a look at the pattern of unprofessional and, you know, leadership behavior and lack of judgment overall during his tenure." Tatarunas's employment was terminated in June 2021. Judy Palczynski, a white female, took over Tatarunas's position after Tatarunas was terminated.

**Complaint and Summary Judgment**

{¶ 15} On February 25, 2022, Tatarunas filed a complaint in the Cuyahoga County Court of Common Pleas, Cuyahoga C.P. No. CV-22-960056. Progressive filed an answer, and on November 22, 2022, Tatarunas filed a notice of voluntary dismissal, dismissing the case without prejudice.

{¶ 16} Tatarunas refiled his case against Progressive in Lorain County Court of Common Pleas, which was eventually transferred to Cuyahoga County Court of Common Pleas, alleging race discrimination, sex discrimination, intentional

infliction of emotional distress, breach of contract, and wrongful termination in violation of public policy. The complaint also included claims against Progressive employee Brian Jackson ("Jackson") alleging tortious interference and coercion and obstruction. Tatarunas ultimately voluntarily dismissed the claims against Jackson. With respect to the remaining claims, the trial court issued a judgment entry noting that "[i]t is abundantly clear that there is no genuine issue of material fact[,]" and granted summary judgment in favor of Progressive.

**Appeal**

{¶ 17} Tatarunas filed a notice of appeal from the trial court's judgment entry granting summary judgment in favor of Progressive. Tatarunas raises the following assignments of error:

1. The trial court committed prejudicial and reversible error when it granted the defendant's motion for summary judgment on the claim for reverse race discrimination.

2. The trial court committed prejudicial and reversible error when it granted the defendant's motion for summary judgment on the claim for reverse sex discrimination.

3. The trial court committed prejudicial and reversible error when it granted the defendant's motion for summary judgment on the claim for intentional infliction of emotional distress.

4. The trial court committed prejudicial and reversible error when it granted the defendant's motion for summary judgment on the claim for wrongful termination in violation of Ohio public policy.

5. The trial court committed prejudicial and reversible error when it granted the defendant's motion for summary judgment on the claim for breach of contract to pay a bonus.

These issues were fully briefed by both parties, and an oral argument was held on May 6, 2025.

{¶ 18} On June 5, 2025, prior to this court issuing a decision in this case, the United States Supreme Court released its decision in *Ames v. Ohio Dept. of Youth Servs.,* 605 U.S. 303 (2025). In *Ames,* the United States Supreme Court altered the burden of proof for a plaintiff in a reverse-discrimination case with respect to demonstrating a prima facie case to support their claim. Pursuant to *Ames*, majority-group plaintiffs are no longer subject to a heightened standard of proof. *See id.*

{¶ 19} In light of *Ames,* we ordered the parties to provide supplemental briefing to discuss the effect, if any, *Ames* had on Tatarunas's reverse-discrimination claims. Both parties filed supplemental briefs discussing the United States Supreme Court's decision in *Ames.*

## Law and Argument

### Summary-Judgment Standard

{¶ 20} We review a trial court's grant of summary judgment de novo. *Warthog Mgmt. LLC v. Fares,* 2024-Ohio-2065, ¶ 17 (8th Dist.). Pursuant to Civ.R. 56(C), a party is entitled to summary judgment if "the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." "The party moving for summary judgment bears the

burden of demonstrating that no material issues of fact exist for trial." *Edvon v. Morales,* 2018-Ohio-5171, ¶ 17 (8th Dist.), citing *Dresher v. Burt,* 75 Ohio St.3d 280, 292 (1996).

{¶ 21} Summary judgment is appropriate where the record provides (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party, who is entitled to have the evidence construed most strongly in his or her favor. *Univ. School v. M.F.,* 2025-Ohio-170, ¶ 11 (8th Dist.), quoting *Bohan v. McDonald Hopkins, L.L.C.,* 2021-Ohio-4131, ¶ 19 (8th Dist.), citing *Horton v. Harwick Chem. Corp.,* 1995-Ohio-286, paragraph three of the syllabus.

**First and Second Assignments of Error**

{¶ 22} In his first and second assignments of error, Tatarunas alleges the trial court erred in granting Progressive's motion for summary judgment on Tatarunas's claims for reverse race discrimination and reverse sex discrimination. Since these claims involve a similar analysis of facts and law, they will be addressed together.

### A. Applicable Law

{¶ 23} R.C. Ch. 4112 governs discrimination actions in Ohio. R.C. 4112.02(A) provides, in relevant part, that it is an unlawful discriminatory practice "[f]or any employer, because of the race . . . [or] sex . . . of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against

that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment."  In reviewing claims of employment discrimination pursued under state law, Ohio courts look to federal antidiscrimination caselaw.  *Dove v. Lakewood,* 2025-Ohio-453, ¶ 34 (8th Dist.), citing *Nelson v. Univ. of Cincinnati,* 2017-Ohio-514, ¶ 31 (10th Dist.), citing *Coryell v. Bank One Trust Co. N.A.,* 2004-Ohio-723, ¶ 15;  *see also Plumbers & Steamfitters Joint Apprenticeship Commt. v. Ohio Civ. Rights Comm.,* 66 Ohio St.2d 192, 196 (1981) (federal caselaw interpreting Title VII of the Civil Rights Act is generally applicable to cases involving alleged violations of R.C. Ch. 4112).

{¶ 24} "[A] plaintiff alleging discrimination bears the initial burden of setting forth a prima facie case of discrimination by using either direct or indirect evidence."  *Glemaud v. MetroHealth Sys.,* 2018-Ohio-4024, ¶ 53 (8th Dist.), citing *Chang v. Univ. of Toledo,* 480 F.Supp.2d 1009, 1013 (N.D. Ohio 2007).  Direct evidence of discrimination is "'evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions.'"  *Wexler v. White's Fine Furniture, Inc.,* 317 F.3d 564, 570 (6th Cir. 2003), quoting *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.,* 176 F.3d 921 (6th Cir. 1999).  "As a practical matter, rarely will there be direct evidence from the lips of an employer proclaiming racial animus."  *Glemaud* at ¶ 54, citing *Robinson v. Runyon,* 149, F.3d 507, 513 (6th Cir. 1998).  Indirect evidence, on the other hand, "'is proof that does not on its face establish discriminatory animus, but does allow a

factfinder to draw a reasonable inference that discrimination occurred.'" *Glemaud* at ¶ 55, quoting *Wexler* at 570.

### *McDonnell Douglas's* Burden-Shifting Framework

{¶ 25} Tatarunas has not presented any direct evidence of discrimination. Rather, Tatarunas claims that based on the evidence he has presented, a jury could infer discrimination was the motivating factor for his termination. "In the absence of any direct evidence, a plaintiff's claim of employment discrimination is analyzed under the burden-shifting framework established by the United States Supreme Court in *McDonnell Douglas v. Green,* 411 U.S. 792 (1973)." *Dove* at ¶ 35, citing *Boutros v. Canton Reg. Transit Auth.,* 997 F.2d 198, 202-203 (6th Cir. 1993).

{¶ 26} Generally, in order to establish a prima facie case of discrimination under *McDonnell Douglas,* a plaintiff must establish that "(1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) he was qualified for the position lost or not gained; and (4) the position remained open or was filled by a person not of the protected class." *Chenevey v. Greater Cleveland Regional Transit Auth.,* 2013-Ohio-1902, ¶ 23 (8th Dist.), citing *McDonnell Douglas* at 802.

{¶ 27} With respect to a claim of "reverse" discrimination, prior to the United States Supreme Court's decision in *Ames,* 605 U.S. 303, for the prima facie case set forth above, the Sixth Circuit imposed a heightened standard on plaintiffs of a majority class. In reverse discrimination actions, the first prong required a plaintiff to show "'background circumstances [to] support the suspicion that the defendant is that unusual employer who discriminates against the majority.'" *Id.,*

quoting *Zambetti v. Cuyahoga Community College,* 314 F.3d 249, 255 (6th Cir. 2002). The fourth prong was also different, requiring the plaintiff to "show that he was treated differently than similarly situated employees of a different race." *Id.*

{¶ 28} The United States Supreme Court's decision rejected the heightened burden that had been placed upon plaintiffs alleging reverse discrimination. In doing so, the Court was clear, "the standard for proving disparate treatment under Title VII does not vary based on whether or not the plaintiff is a member of a majority group." *Ames* at 1546. "By establishing the same protections for every 'individual'—without regard to that individual's membership in a minority or majority group—Congress left no room for courts to impose special requirements on majority-group plaintiffs alone." *Id.* Relying on this principle, the Court specifically rejected the "background circumstances" requirement as set forth above. *See id.* at 1547 – 1548.

{¶ 29} In light of the *Ames* decision, we review Tatarunas's claim of reverse discrimination as we would any other discrimination claim. If Tatarunas can establish a prima facie case of discrimination under the *McDonnell Douglas* framework, there is a presumption that Progressive unlawfully discriminated against him, and the burden shifts to Progressive to produce evidence that its actions were based on legitimate nondiscriminatory reasons. *Chenevey* at 25, citing *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 254 (1981). If Progressive produces a legitimate nondiscriminatory reason for terminating Tatarunas's employment, the burden would then switch back to Tatarunas to show that

Progressive's stated reason is merely a pretext for unlawful discrimination; but the ultimate burden of persuasion remains at all times with Tatarunas. *Dove,* 2025-Ohio-453, at ¶ 37 (8th Dist.), citing *Chenevey* at 25.

## B. Analysis

### 1. Reverse Race Discrimination

{¶ 30} It is undisputed that the second and third prongs of Tatarunas's prima facie case for race discrimination have been established. And in light of *Ames,* 605 U.S. 303, the first factor, whether the plaintiff is a member of a protected class is no longer applicable, since the Court made clear that the prima facie case is the same for all individual plaintiffs, regardless of the group they are a member. Notably, in its supplemental briefing to this court Progressive claims that Tatarunas "cannot establish the fourth element of his prima facie case of either race or sex discrimination." As such, the parties dispute whether the trial court properly granted summary judgment because Tatarunas failed to establish a prima facie case of discrimination. Progressive also argues that even if Tatarunas had established a prima facie case, Progressive had a legitimate, nondiscriminatory reason for terminating Tatarunas.

{¶ 31} The United States Supreme Court has recognized that "the first step of the *McDonnell Douglas* framework–the prima facie burden–is 'not onerous." *Ames* at 1545, quoting *Tex. Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253 (1981). A plaintiff may satisfy his/her burden by presenting evidence "'that she applied for an available position for which she was qualified, but was rejected under

circumstances which give rise to an inference of unlawful discrimination.'" *Id.,* quoting *Burdine* at 253.

{¶ 32} In order to satisfy the fourth prong of a prima facie case for discrimination, the plaintiff must demonstrate that "the position remained open or was filled by a person not of the protected class." *Chenevey,* 2013-Ohio-1902, at ¶ 23 (8th Dist.).

{¶ 33} Neither party disputes that the person responsible for terminating Tatarunas's employment, Carly Scherrer, is white, which makes his claims of racial discrimination less plausible. *See Drummond v. IPC Internatl.,* 400 F.Supp.2d 521, 532 (E.D.N.Y. 2005), citing *Tolliver v. Community Action Comm. to Help the Economy, Inc., Cache,* 613 F.Supp.1070, 1074 (S.D.N.Y. 1985). Tatarunas has not directed this court to any person involved in his termination that was of a different race than himself. It is also undisputed that after he was terminated his position was filled by a person of the same race.

{¶ 34} In support of his claim that he was discriminated against based on his race is an email that Jackson sent to Tatarunas, Simpson, and Davis on May 3, 2021, following an interview Jackson had with Tatarunas.[1] There is no indication

---

[1] The email reads, in relevant part:

Thank you Vidas & Team,

I feel strongly that this entire team could benefit greatly from working to understand biases and how they can impact leaders and thus employees if left unconscious and thus unchallenged. I suggest the entire 7 module

that the bias Jackson complained of in this email was "racial" bias. Rather, when asked about this email during his deposition, Jackson rejected the implication that the bias discussed in the email was racial. Jackson testified, in relevant part:

> Q: Then you go on to talk about these diversity and inclusion programs and websites for people to look at. The bias you are talking about is based on diversity and inclusion, correct? . . .
>
> . . .
>
> [Jackson]: Yes, right. Understanding our own unconscious biases, so that we can manage those biases in a professional environment.
>
> Q: The unconscious bias you are speaking to is your black race, correct?
>
> . . .
>
> [Jackson]: I never said that.
>
> (* * *)
>
> Q: You are the one that wrote diversity and inclusion. What has to be diverse and who has to be included?
>
> [Jackson]: Don't I say diversity of thought is a business imperative?
>
> Q: Um-hum.
>
> [Jackson]: What is racial about that?

---

> *Creating an Inclusive Environment e-learning* series for leaders in general, with special emphasis on module 6 *Providing Opportunity* which goes over the imperative for leaders to be aware of and challenge their biases when evaluating talent. Diversity of thought is a business imperative, for innovation to exist.
>
> My experience with this hiring process has lead me to the conclusion at there is a urgent need for real Diversity and Inclusion work within this part of the IT PM organization. I am happy to help any way I can.
>
> . . .

. . .

Q: When you are talking about diversity and inclusion in the workplace, you are talking about people of color and minorities and women being hired, right? . .

[Jackson]: No.

Q: Then what are you talking about?

[Jackson]: I state clearly here diversity of thought.

{¶ 35} Furthermore, Jackson is of mixed-race heritage. Tatarunas, Simpson, and Davis are white. Even if we were to assume that the bias of which Jackson was referring to was racial in nature, this is not evidence that Progressive terminated his employment based on race.

{¶ 36} There is nothing in the record from which an inference can be made that Progressive terminated Tatarunas because he was white. Particularly in light of the fact that he was replaced by a person of the same race and he was terminated by a person of his same race. As such, Tatarunas failed to present sufficient evidence in support of an inference that he was unlawfully terminated based on his race and therefore failed to present a prima facie case of race discrimination.

2. **Reverse Sex Discrimination**

{¶ 37} It is undisputed that the second and third prongs of Tatarunas's prima facie case for sex discrimination have been established. And for the same reasons stated above, the first prong of the prima facie case is no longer applicable. And again, in its supplemental briefing to this Court, Progressive focuses solely on

the fourth prong. Progressive also argues that even if Tatarunas had established a prima facie case, Progressive had a legitimate, nondiscriminatory reason for terminating Tatarunas.

**Failure to Move for Summary Judgment on the Reverse Sex-Discrimination Claim**

{¶ 38} We begin our discussion by addressing Tatarunas's claim that Progressive did not seek full dismissal of the reverse sex-discrimination claim in its motion for summary judgment and, therefore, the trial court erred in dismissing the claim in full. Tatarunas's assertion is belied by the record. In its motion for summary judgment, Progressive specifically requested the trial court to grant summary judgment on Tatarunas's reverse sex-discrimination claim, alleging that Tatarunas had failed to support his prima facie case. Progressive also claimed that it had presented a lawful, nondiscriminatory reason for terminating Tatarunas.

{¶ 39} Since Progressive moved for summary judgment with respect to Tatarunas's reverse sex-discrimination claim, the trial court's decision granting summary judgment in favor of Progressive with respect to this claim is properly before this court for review.

**Prima Facie Case for Sex Discrimination**

{¶ 40} Similar to demonstrating a prima facie case for race discrimination, in order to establish the fourth prong of his prima facie case for sex discrimination, Tatarunas must establish that "the position remained open or was filled by a person not of the protected class." *Chenevey,* 2013-Ohio-1902, at ¶ 23 (8th Dist.).

{¶ 41} It is undisputed that the person responsible for terminating Tatarunas's employment, Carly Scherrer, is a female. And that Judy Palczynski, a white female, took over Tatarunas's position after Tatarunas was terminated. Here, Tatarunas was fired by a female, a member of a separate class, and he was replaced by another female. As such, Tatarunas satisfied his burden demonstrating a prima facie case of sex discrimination.

### 3.     Legitimate, Nondiscriminatory Reason for Termination

{¶ 42} Even if Tatarunas had made a prima facie case for race and sex discrimination, the burden shifts back to Progressive to produce evidence to show a legitimate, nondiscriminatory reason for terminating him. Here, "the burden is one of production, not persuasion, and is satisfied if [Progressive] presents evidence 'which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action.'" *Dove,* 2025-Ohio-453, at ¶ 42 (8th Dist.), quoting *Kenner v. Grant/Riverside Med. Care Found.,* 2017-Ohio-1349, ¶ 28 (10th Dist.).

{¶ 43} Progressive presented evidence demonstrating that it had a legitimate, nondiscriminatory reason for terminating Tatarunas's employment. As discussed above, Progressive produced three separate disciplinary warnings that Tatarunas received within a five-year period. Progressive also introduced the investigative report conducted as a result of Jackson's complaints. While the report concluded that there was insufficient evidence to demonstrate that Tatarunas was biased during the Jackson interview, the investigation revealed additional

unprofessional conduct by Tatarunas. As such, Progressive has produced evidence of a legitimate, nondiscriminatory basis to terminate Tatarunas's employment.

{¶ 44} Having produced evidence of a legitimate, nondiscriminatory basis for terminating Tatarunas's employment, "[t]he burden now shifts to [Tatarunas] to demonstrate, by a preponderance of the evidence, that the reason [Progressive] offered is a pretext for discrimination." *Dove* at ¶ 45, citing *McDonnell Douglas,* 411 U.S. at 807. In order to demonstrate pretext, Tatarunas "must ultimately prove both that the employer's stated reason for the adverse employment decision 'was not the real reason for its action, and that the employer's real reason' was discrimination." *Peters v. Highland Hills,* 2024-Ohio-2366, ¶ 41 (8th Dist.), quoting *E.E.O.C. v. Ford Motor Co.,* 782 F.3d 753, 767 (6th Cir. 2015). At the summary-judgment stage, a plaintiff can create a genuine issue of fact "by producing evidence that the employer's stated reason (1) had no basis in fact, (2) did not actually motivate the employer's actions, or (3) was insufficient to motivate the employer's actions." *Peters* at ¶ 41, citing *Briggs v. Univ. of Cincinnati,* 11 F.4th 498, 515 (6th Cir. 2021).

{¶ 45} Tatarunas alleges that Progressive used his documented disciplinary history and the investigation conducted by Lauer as a pretext to fire him in order to protect itself from a potential race discrimination lawsuit from Jackson. Tatarunas again directs this court to the May 1, 2021 email sent by Jackson advising "Vidas and team" that they "could benefit greatly from working to understand biases and how they can impact leaders and thus employees if left unconscious and thus unchallenged." As discussed above, this email does not indicate that the biases

Jackson was referring to were racial biases and, when he was interviewed in his deposition, Jackson rejected the implication that the bias discussed in the email was racial. Nor does this email indicate bias on the basis of sex.

{¶ 46} Tatarunas also references an email purportedly sent by Jackson on December 8, 2023, alleging that Jackson had been subjected to "overt racism and discrimination by management[.]" However, this email was sent almost two-and-a-half years after Tatarunas had been terminated. It gives no insight as to what Progressive knew about Jackson's intentions with respect to filing a lawsuit when Progressive terminated Tatarunas's employment in June 2021.

{¶ 47} Tatarunas has presented no evidence indicating that, prior to his termination, Jackson believed he had been racially discriminated against and was intending to file a discrimination lawsuit against Progressive. Nor has he presented any evidence that Progressive believed a lawsuit from Jackson was forthcoming. "'Mere conjecture that [the] employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment.'" *Olive v. Columbia/HCA Healthcare Corp.,* 2000 Ohio App. LEXIS 914, *25 (8th Dist. Mar. 9, 2000), quoting *Branson v. Price River Coal Co.,* 853 F.2d 768, 772 (10th Cir. 1988).

{¶ 48} With respect to the sex-discrimination claim, Tatarunas claims that Jackson accused Tatarunas, Davis, and Simpson of bias in Jackson's May 1, 2021 email, but only Tatarunas was fired. But as will be discussed below, Tatarunas was

in a substantially different situation than Davis or Simpson. Particularly with respect to their disciplinary history.

{¶ 49} First, the emails from Jackson to Tatarunas, Davis, and Simpson were premised on the interview Jackson had with Tatarunas. When reviewing the emails as a whole, it is clear that Jackson's claims stemmed from his interview with Tatarunas and the way he was purportedly treated by Tatarunas in the interview. It is undisputed that neither Davis nor Simpson were involved in Jackson's first interview. Further, the investigation into Jackson's claims of bias, which was conducted by Maurene Laurer, concluded "that there were no findings to support a biased interview for [Jackson.]"

{¶ 50} Second, Tatarunas had a lengthy and consistent disciplinary history within Progressive leading up to his termination. While Tatarunas downplays the significance of his prior disciplinary history, prior to the unprofessional conduct revealed during the investigation of bias allegations in the Jackson interview, Tatarunas had received three separate verbal and written warnings within a five-year time period. As the investigative report recognized, they each had "a similar theme of communication and leadership behaviors[.]" The investigation, which was conducted with respect to Jackson's complaints, found no indication of bias, yet did find "further evidence of unprofessional behavior in a separate interaction with an external candidate[.]" Notably, the investigation revealed that Tatarunas had received a pre-interview confirmation email from a separate, external candidate that included a Lithuanian phrase for "thanks" to which Tatarunas responded to the

candidate: "butt kisser. Butt I like it. See you then!!" There is nothing in the record indicating that Simpson or Davis had a similar disciplinary history.

{¶ 51} The record fails to demonstrate that Tatarunas's sex was a motivating reason for his termination. Davis and Simpson were not in a similar position as Tatarunas when he was terminated by Progressive. Tatarunas had a number of disciplinary actions. The record reflects that neither Davis nor Simpson had a disciplinary history. Davis and Simpson were also not involved in the interview that resulted in Jackson's claims of bias and his claims of unprofessionalism with respect to his interview with Tatarunas. As such, Tatarunas has failed to demonstrate that Progressive's legitimate, nondiscriminatory reason for his termination was pretextual.

{¶ 52} After a thorough review of the record, we cannot conclude that material issues of fact exist regarding Tatarunas's race and sex-discrimination claims. Tatarunas presents no evidence to suggest that he was terminated by Progressive on account of his race. Nor has he presented any evidence that Progressive terminated him because he was a male, rather than his disciplinary history. As such, Progressive had a legitimate, nondiscriminatory reason to terminate his employment. Tatarunas has failed to demonstrate that Progressive's reason for doing so was pretextual. Therefore, his first two assignments of error are overruled.

**Third Assignment of Error**

{¶ 53} In his third assigned error for review, Tatarunas alleges that the trial court erred when it granted Progressive's motion for summary judgment on his claim for intentional infliction of emotional distress.

### A. Applicable Law

{¶ 54} In order to establish a claim for intentional infliction of emotional distress, Tatarunas must demonstrate that (1) Progressive intended to cause Tatarunas serious emotional distress; (2) Progressive's conduct was extreme and outrageous, and (3) Progressive's conduct was the proximate cause of Tatarunas's serious emotional distress. *Nikooyi v. Nikooyi,* 2022-Ohio-3239, ¶ 15 (8th Dist.), citing *Phung v. Waste Mgt., Inc.*, 1994-Ohio-389.

{¶ 55} Moreover, to support an intentional infliction of emotion distress claim, "the plaintiff bears the burden of proving that he sustained a severe emotional injury." *Nikooyi* at ¶ 17, citing *Allen v. Pirozzoli,* 2016-Ohio-2645, ¶ 11 (8th Dist.). "'A plaintiff can prove severe and debilitating emotional injury through the testimony of an expert or lay witnesses acquainted with the plaintiff who have observed significant changes in the emotional or habitual makeup of the plaintiff.'" *Id.,* quoting *id.*

### B. Analysis

{¶ 56} Tatarunas has failed to demonstrate that Progressive's conduct in terminating his employment was "extreme and outrageous." The Supreme Court of Ohio has defined "extreme and outrageous conduct" as "conduct that goes beyond

all possible bounds of decency and is so atrocious that it is 'utterly intolerable in a civilized community.'" *Id.* at ¶ 16, quoting *Yeager v. Local Union 20,* 6 Ohio St.3d 369, 375 (1983). As such, "'[p]arties cannot generally be held liable for intentional infliction of emotional distress for having performed an act they were legally entitled to perform.'" *Mangelluzzi v. Morley,* 2015-Ohio-3143, ¶ 49 (8th Dist.), quoting *Morrow v. Reminger & Reminger Co. LPA,* 2009-Ohio-2665, ¶ 49 (10th Dist.). "Unfortunately, people get fired every day, and suffer mental anguish as a result. However, absent evidence of extreme and outrageous conduct in the termination of an employee, no cause of action for Intentional Infliction of Emotional Distress will arise." *Cox v. Kettering Med. Ctr.,* 2005-Ohio-5003, ¶ 33 (2d Dist.).

{¶ 57} As discussed above, Progressive had a legitimate, nondiscriminatory, reason for terminating Tatarunas's employment based on Tatarunas's disciplinary history while at Progressive. Tatarunas has failed to present any additional evidence that Progressive's actions, legally terminating an at-will employee, are either extreme or outrageous. As such, Progressive's conduct cannot be considered extreme and outrageous to support a claim for intentional infliction of emotional distress.

{¶ 58} Furthermore, Tatarunas failed to present any evidence establishing that he suffered a severe emotional injury as a result of his termination. He did not present any expert opinion or lay witness testimony concerning any significant changes in his emotional or habitual makeup. Rather, the only evidence presented is his own claims that he suffered serious mental distress after being fired. However,

self-serving statements alone are not sufficient to establish that he suffered severe emotional stress. *Nikooyi,* 2022-Ohio-3239, ¶ 17 (8th Dist.) (recognizing that a plaintiff's own self-serving statements are insufficient to establish he suffered a severe emotional injury). *See also Burks v. Tolbert,* 2009-Ohio-486, ¶ 20 (8th Dist.) (holding that a self-serving affidavit is insufficient to overcome summary judgment with respect to this element of intentional infliction of emotional distress).

{¶ 59} Tatarunas failed to demonstrate that Progressive's decision to terminate his employment was extreme and outrageous, nor did he present any evidence, outside his own self-serving statements, that he suffered a severe emotional injury as a result. For these reasons, the trial court did not err when it granted Progressive's motion for summary judgment with respect to his intentional infliction of emotional distress claim. Tatarunas's third assignment of error is overruled.

**Fourth Assignment of Error**

{¶ 60} In his fourth assignment of error, Tatarunas alleges that the trial court erred when it granted Progressive's motion for summary judgment on his claim for wrongful termination in violation of public policy.

{¶ 61} "The employment-at-will doctrine, the rule that general or indefinite hiring is terminable at the will of either party for any cause or no cause, is the traditional rule in Ohio." *House v. Iacovelli,* 2020-Ohio-435, ¶ 11, citing *Collins v. Rizkana,* 73 Ohio St.3d 65, 67-68 (1995). The tort of wrongful termination in

violation of public policy is an exception to this rule. *Id.,* citing *Greeley v. Miami Valley Maintenance Contrs.,* 49 Ohio St.3d 228, 234 (1990).

{¶ 62} In order to prevail on his wrongful termination in violation of public policy claim, Tatarunas must establish four elements:

> (1) that a clear public policy existed and was manifested either in a state or federal constitution, statute or administrative regulation or in the common law ("the clarity element"), (2) that dismissing employees under circumstances like those involved in [Tatarunas's] dismissal would jeopardize the public policy ("the jeopardy element"), (3) that [Tatarunas's] dismissal was motivated by conduct related to the public policy ("the causation element"), and (4) that [Progressive] lacked an overriding legitimate business justification for the dismissal ("the overriding-justification element").

*House* at ¶ 12.

{¶ 63} "The clarity and jeopardy elements are questions of law to be determined by the court." *Id.,* citing *Collins* at 70. "The causation and overriding-justification elements are, however, questions to be determined by the finder of fact." *Id.* We begin our analysis by considering the clarity element before determining whether it is necessary to address the remaining elements of his claim.

{¶ 64} In order to satisfy the clarity element of a wrongful-termination claim, "'a terminated employee must articulate a clear public policy by citation to specific provisions in the federal or state constitution, federal or state statutes, administrative rules and regulations, or common law.'" *Sygula v. Regency Hosp. of Cleveland E.,* 2016-Ohio-2843, ¶ 32 (8th Dist.), quoting *Rebello v. Lender Processing, Servs.,* 2015-Ohio-1380, ¶ 29 (8th Dist.). "'A public policy sufficient to overcome the presumption in favor of employment at will is not limited to instances

in which the statute expressly forbids termination, but may be discerned from legislation generally, or from other sources of law.'" *Id.,* quoting *id.*

{¶ 65} Tatarunas contends that there is a public policy against terminating an employee who has threatened litigation or to preempt potential litigation. In support, he cites to Ohio Const., art. I, § 16, which provides: "All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay. Suits may be brought against the state, in such courts and in such manner, as may be provided by law."

{¶ 66} Courts in Ohio have recognized that it is against public policy for employers to terminate employees for exercising their right to consult an attorney. *Chapman v. Adia Servs.,* 116 Ohio App.3d 534, 544 (1st Dist. 1997) (holding that "it is repugnant to the public policy of this state for employers to terminate employees for exercising their right to consult a lawyer.") But appellate courts throughout Ohio "have not uniformly expanded this public policy to include employees who sue their employer." *Vinsant v. WNB Group LLC,* 2024 U.S. Dist. LEXIS 133381, *13 – 14 (S.D.Ohio July 29, 2024). *See Taylor v. Volunteers of Am.,* 2003-Ohio-4306, ¶ 12 (1st Dist.) (declining to expand the policy in *Chapman* concerning an employee's right to consult an attorney and holding that there is no public policy protecting an employee from termination that files suit against their employer). *But see Jenkins v. Parkview Counseling Ctr.,* 2001 Ohio App. LEXIS 133, *23 (7th Dist. Jan. 3, 2001) (recognizing it is against public policy for an employer to terminate an employee in

retaliation for a previous lawsuit the employee brought against the employer). Tatarunas fails to direct us to any caselaw from the Ohio Supreme Court or the Eighth District Court of Appeals recognizing a clear public policy precluding an employer from terminating an employee for threatening litigation against the employer in order to preempt potential litigation. In fact, our court has previously noted that "the Ohio Supreme Court has declined to create an exception to the common law employment-at-will doctrine for an employer's alleged violation of the Ohio Constitution." *Takach v. Am. Med. Tech.,* 128 Ohio App.3d 457, 465 (8th Dist. 1998), citing *Provens v. Stark Cty. Bd. of Mental Retardation & Developmental Disabilities,* 64 Ohio St.3d 252, 261 (1992).

{¶ 67} In support of his claim, Tatarunas directs us to an email sent by Sherrer on June 22, 2021, memorializing a conversation she had with Tatarunas. In the email, Sherrer notes that towards the end of her conversation with Tatarunas, Tatarunas stated that "he better not be getting a final written [sic] or he will sue. Said he knows others who have had success suing Progressive." In rejecting the type of public policy advocated for by Tatarunas, the First District cautioned that "[i]f filing a suit were a protected decision . . . there would be a danger that an employee, anticipating an adverse job action due to poor performance, would file suit against his employer as a 'preemptive strike' against termination." *Taylor* at ¶ 12. As such, Tatarunas's statements, documented in the email sent by Sherrer on June 22, 2021, is exactly the type "preemptive strike" the *Taylor* Court warned of. As such, these statements by Tatarunas as set forth in Sherrer's email are not protected by public

policy, and therefore do not fall under an exception to the employment-at-will doctrine.

{¶ 68} Tatarunas also claims that he was fired because his coworker, Jackson, had accused him of being racially biased that could subject Progressive to legal action.[2] Tatarunas does not direct us to any cases that support the proposition that public policy precludes an employer from firing an employee in fear that another employee may pursue litigation against the employer. Each of the cases Tatarunas cites involves a plaintiff who either commenced litigation against their employer, threatened to commence litigation against their employer, or conferred with legal counsel prior to being terminated. In short, Tatarunas has failed to demonstrate a clear public policy precluding an employer from terminating an employee that may have subjected the employer to potential legal actions taken, or that may be taken by, another employee.

{¶ 69} Tatarunas has failed to demonstrate the clarity element of his wrongful-termination claim that Progressive terminated him in violation of clear Ohio public policy. Since we have determined that Progressive was entitled to summary judgment as a matter of law with respect to the clarity element of his claim for wrongful termination in violation of public policy, it is unnecessary to address

---

[2] As discussed above, there is nothing in the record indicating that Jackson had accused Tatarunas of racial bias. And when later asked in a deposition whether the bias he had accused Tatarunas was racial, Jackson rejected the assertion.

the remaining three elements. Accordingly, Tatarunas's fourth assignment of error is overruled.

**Fifth Assignment of Error**

{¶ 70} In his fifth, and final, assignment of error, Tatarunas alleges that the trial court erred when it granted Progressive's motion for summary judgment on his claim for breach of contract to pay a bonus. As an employee of Progressive, Tatarunas participated in Progressive's Gainshare plan. This plan is a bonus plan available to Progressive employees. The terms of the plan provide that to be eligible to receive a payment under the plan, a participant must be employed with the company on November 30 of the plan year. Tatarunas was a participant in the 2021 Progressive Gainshare plan. Tatarunas claims that he was entitled to a performance bonus earned pursuant to a 2021 Progressive Gainshare plan that he was a participant in prior to termination.

{¶ 71} In order to prevail on his claim for breach of contract, Tatarunas has the burden of proving four elements: (1) the existence of a contract; (2) he performed under the contract; (3) a breach of the contract by Progressive; and (4) that he suffered damages or loss as a result. *Rogers v. Natl. City Corp.,* 2009-Ohio-2708, ¶ 15 (8th Dist.), citing *Jarupan v. Hanna,* 2007-Ohio-5081, ¶ 18 (10th Dist.).

{¶ 72} "The construction of a written contract is a matter of law that is reviewed de novo." *Rockside-77 Props., L.L.C. v. Partners Fin. Group, L.L.C.,* 2018-Ohio-4112, ¶ 14 (8th Dist.), citing *Alexander v. Buckeye Pipe Line Co.,* 53 Ohio St.2d 241 (1978), paragraph one of the syllabus. "Generally, courts presume that the

intent of the parties to a contract resides in the language they chose to employ in the agreement." *Shifrin v. Forest City Ents., Inc.,* 64 Ohio St.3d 635, 638 (1992), citing *Kelly v. Med. Life Ins. Co.,* 31 Ohio St.3d 130 (1987). As such, we "'need not go beyond the plain language of the agreement to determine the parties' rights and obligations if a contract is clear and unambiguous.'" *Rockside-77 Props., L.L.C.* at ¶ 14, quoting *Maines Paper & Food Serv., Inc. v. Eanes,* 2000 Ohio App. LEXIS 4480, * 6 (8th Dist. Sept. 28, 2000).

{¶ 73} Attached to its motion for summary judgment, Progressive submitted a purported copy of the Progressive Corporation 2021 Gainshare Plan. Section 9 of the plan provides, in relevant part:

> **Qualifications; Leave of Absence; Withholding.** Unless otherwise determined by the Committee, and except as expressly provided herein, in order to be entitled to receive an Annual Gainshare Payment for a Plan year, the participant must be an active officer or regular employee of the Company on November 30 of the Plan year ("Qualification Date"). An individual (i) who is hired on or after December 1 of any Plan year or (ii) whose employment terminates for any reason prior to the Qualification Date is not entitled to an Annual Gainshare Payment for that Plan year. Annual Gainshare Payments are not earned until paid.

{¶ 74} By the plain terms of this agreement, a participant in the 2021 Gainshare plan is not entitled to payment under this plan if their employment terminates for any reason prior to November 30, 2021.

{¶ 75} Tatarunas's employment with Progressive ended in June 2021, months before the qualification date set forth in the terms of the agreement. By the

plain language of the plan, Tatarunas failed to comply with this specific term of the agreement.

{¶ 76} Ohio appellate courts have addressed similar employment bonus agreements. *See Rusu v. Carter-Jones Lumber Co.,* 2023-Ohio-2927, ¶ 15 (11th Dist.)(recognizing that the employer did not breach a written bonus agreement since the plaintiff was not an employee on the date the bonuses were distributed where the express term of a written bonus agreement provided that an employee would be eligible for a bonus only if the employee was still employed at the time the bonus was distributed); *Airtron, Inc. v. Tobias,* 2021-Ohio-2213 (2d Dist.). The facts in *Airtron* are similar to the facts before us. An employee had left employment prior to the payout of the bonus. The employee argued that he had earned the bonus as part of his compensation package. *Id.* at ¶ 47. The Second District determined that the terms of the bonus plan required the employee to be employed by Airtron when the bonus was paid out. The court concluded, "[I]t is not the responsibility of this court to 'rewrite the parties' contract in order to provide for a more equitable result.'" *Id.* at ¶ 48, quoting *Hope Academy Broadway Campus v. White Hat Mgt., L.L.C.,* 2015-Ohio-3716, ¶ 36-37.

{¶ 77} Pursuant to the plain terms set forth in the 2021 Progressive Gainshare plan, Tatarunas was not entitled the annual Gainshare Payment since he was not employed with Progressive on the qualification date set forth in the plan. Therefore, there is no genuine issue of material fact with respect to Tatarunas's

breach-of-contract claim. As a result, Tatarunas's final assignment of error is overruled.

## Conclusion

{¶ 78} Based on our review of the record and reviewing all of the evidence in a light most favorable to Tatarunas, we are unable to conclude that Tatarunas has created a genuine issue of material fact in any of the claims he presented to the trial court. Accordingly, Progressive is entitled to summary judgment as a matter of law.

{¶ 79} Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MICHELLE J. SHEEHAN, PRESIDING JUDGE

ANITA LASTER MAYS, J., CONCURS;
SEAN C. GALLAGHER, J., CONCURS (WITH SEPARATE OPINION)


SEAN C. GALLAGHER, J., CONCURRING:

{¶ 80} I fully concur with the majority opinion and agree that the trial court's decision to grant summary judgment in favor of Progressive should be affirmed. I write to further address our review of Tatarunas's claims of discrimination.

{¶ 81} The United States Supreme Court recently held in *Ames v. Ohio Dept. of Youth Servs.*, 605 U.S. 303 (2025), that the Sixth Circuit's "background circumstances" rule, which requires members of a majority group to satisfy a heightened evidentiary standard on a Title VII disparate-treatment claim, is not consistent with Title VII's text or the Supreme Court's precedents. *Ames* at 306. As the Supreme Court stated, "Title VII's disparate-treatment provision draws no distinctions between majority-group plaintiffs and minority-group plaintiffs" and "imposes the same prima facie burden on majority-group plaintiffs that it imposes on minority-group plaintiffs." *Ames* at 309, 311. The Supreme Court recognized that its decision in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), sets forth the "traditional framework for evaluating disparate-treatment claims that rest on circumstantial evidence[,]" *Ames* at 306, and the Supreme Court reiterated the familiar three-step burden-shifting inquiry that was laid out in *McDonnell Douglas*. *Ames* at 308-309. For purposes of the *Ames* decision, the Supreme Court "assume[d] without deciding that the *McDonnell Douglas* framework applies at the summary-judgment stage of the litigation." *Ames* at 308, fn. 2.

{¶ 82} The concurring opinion authored by Justice Thomas in *Ames* highlights "the problems that arise when judges create atextual legal rules and frameworks[,]" such as the "background circumstances" rule and the *McDonnell Douglas* framework. *Ames* at 313 (Thomas, J., concurring). As stated by Justice Thomas, "[j]udge-made doctrines have a tendency to distort the underlying statutory text, impose unnecessary burdens on litigants, and cause confusion for the

courts." *Id.* However, "[n]otwithstanding [the Supreme Court's] steps to limit *McDonnell Douglas*, it is now the framework that 'courts typically apply' 'to determine whether the plaintiff has proffered sufficient evidence to survive summary judgment.'" *Ames* at 321 (Thomas, J., concurring), quoting *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 776 (6th Cir. 2016). It remains a viable evidentiary tool.

{¶ 83} As recognized by the majority in *Ames*, "*McDonnell Douglas* merely aims to provide a sensible, orderly way to evaluate the evidence that bears on the critical question of discrimination." (Cleaned up.) *Ames* at 308, fn. 2. Moreover, "[t]he *McDonnell Douglas* framework aims to 'bring the litigants and the court expeditiously and fairly to th[e] ultimate question' in a disparate-treatment case — namely, whether 'the defendant intentionally discriminated against the plaintiff.'" *Ames* at 308, quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

{¶ 84} In this case, the parties presented arguments under the *McDonnell Douglas* framework. As the majority herein determines, a review of the record shows Tatarunas failed to meet his initial burden of establishing a prima facie case for his claim of race discrimination. Though I also question whether he has presented enough evidence to support an inference of discriminatory motive for his claim of sex discrimination, I agree with the analysis provided by the majority of the "judge-made" factors for establishing a prima facie case, which were argued by the parties herein. However, "the precise requirements of a prima facie case can vary

depending on the context and were never intended to be rigid, mechanized, or ritualistic." (Cleaned up.) *Ames*, 605 U.S. at 311. Indeed, the "'facts necessarily will vary'" and "'the prima facie proof required' can therefore differ from case to case." *Id.*, quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002). Regardless, even if Tatarunas met the initial burden, as the majority finds, Progressive presented evidence of a legitimate nondiscriminatory reason for terminating Tatarunas based on his disciplinary history, and Tatarunas failed to present sufficient evidence to demonstrate pretext. Thus, Tatarunas cannot succeed under the *McDonnell Douglas* framework.

{¶ 85} The majority opinion has reviewed Tatarunas's claims of race and sex discrimination as we would any other discrimination claim. Ultimately, he has not proffered sufficient evidence upon which reasonable minds could conclude Progressive intentionally discriminated against him. Further, he has otherwise failed to present sufficient evidence to create any genuine dispute on his claims. I agree with the majority that upon the record before us, no genuine issues of material fact exist, and I concur with the determination that Progressive is entitled to summary judgment as a matter of law on all claims.